IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

   **Plaintiff,**

          v.                              CRIMINAL NO. 20-261 (RAM)

RICARDO JAVIER ESCOBAR-LOPEZ,

   **Defendant.**

_____

OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, United States District Judge

      Pending before the Court is defendant Ricardo Javier Escobar-Lopez's ("Escobar-Lopez" or "Defendant") *Motion to Suppress*. (Docket No. 38). Defendant seeks to suppress evidence obtained and statements made during his encounter with law enforcement agents on August 10, 2020. Id. Having considered the parties' submissions and the evidence presented at the evidentiary hearing, the Court **DENIES** the *Motion to Suppress* for the reasons set forth below.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

   **A. Relevant Facts**

      On August 10, 2020, Escobar-Lopez and Kermith Ruemmele ("Ruemmele") flew from Philadelphia, Pennsylvania to San Juan, Puerto Rico on an American Airlines flight. (Docket Nos. 57-1; 58 at 10). Upon landing at Luis Muñoz Marín International Airport, they walked through the baggage claim area and out of the airport

towards the rental car area. (Docket No. 58 at 8). Just outside of
the airport doors, Task Force Officers ("TFOs") Eduardo Ruisanchez
("TFO Ruisanchez") and Anthony Ayala ("TFO Ayala") initiated a
consensual conversation with Defendant and Ruemmele. Id. at 8-9.
Though they were dressed in civilian clothes, the TFOs identified
themselves as law enforcement officers. Id. at 61. Defendant and
Ruemmele agreed to speak with the TFOs and handed over their
driver's licenses. Id. at 9-10. They then answered a series of
questions regarding, among other things, the purpose and duration
of their trip to Puerto Rico and the contents of their luggage.
Id. at 10-12. During this conversation, Defendant told the TFOs he
had $7,000 in his backpack. Id. at 12.

    Following this statement, the TFOs asked Defendant and
Ruemmele to return to the baggage claim area in the airport so a
trained canine could "sniff" their luggage, to which Defendant and
Ruemmele agreed. Id. at 12-13. TFO Luis Eduardo Santos-Cordova
("TFO Santos-Cordova") and several additional law enforcement
officers were waiting in the baggage claim area with Chivika, the
canine, who completed the sniff in a matter of minutes. Id. at 79-
80, 83. Defendant never withdrew his consent to the sniff. Id. at
80. The canine alerted to the presence of controlled substances
within Defendant's backpack and suitcase. Id. at 13, 79.[1] Defendant

---

[1] The canine also alerted to the presence of controlled substances in Ruemmele's
bags. However, Defendant has conceded that he lacks standing to challenge
evidence recovered from Ruemmele's luggage. (Docket Nos. 53 at 15; 58 at 28).

then verbally consented to the TFOs searching his luggage. (Docket
No. 58 at 13). When asked if he had any money, controlled
medication, explosives, or anything illegal inside of his luggage,
Defendant repeated that he had $7,000 in his backpack but nothing
in his suitcase. Id. at 13-14. However, when the TFOs opened and
looked through the suitcase, they found a large amount of cash
stuffed into socks and hidden in pants pockets. Id. at 16-17.

After finding the money in the clothing, the officers asked
Defendant to accompany them to a secondary location where it would
be safer to remove and count the money. Id. at 17. At the
evidentiary hearing, Special Agent John Wardlow ("Agent Wardlow"),
who was on the scene at the time, testified that moving an
individual with large sums of cash out of the public baggage claim
area is standard safety procedure. Id. at 90. Defendant and the
officers made the approximately five-minute journey to the third
floor of the airport, known as the Customs and Border Protection
("CBP") area. Id. at 18. Escobar-Lopez was not handcuffed at this
time and carried his own luggage to the CBP area. Id. at 19.

Once they arrived at the CBP area, and before the officers
inspected the luggage any further, Defendant signed an FBI Consent
to Search form which granted the officers permission to search his
luggage. (Docket Nos. 57-3; 58 at 20-21). Ultimately, the TFOs
discovered over $80,000 in cash in Defendant's luggage. (Docket
No. 58 at 21, 91).

Upon discovering the cash, the officers asked Defendant to move into a small room directly off of the larger CBP area, and Defendant agreed. Id. at 93. Once inside that room, TFO Ruisanchez read and explained to Defendant his rights and Defendant signed an Advice of Rights form. (Docket Nos. 57-8; 58 at 67-68, 93). While Defendant was never told that he had to sign this form, he was instructed that if he chose to speak, he was required to tell the truth. (Docket No. 58 at 93, 112-13).

After Escobar-Lopez signed the form, Agent Wardlow began questioning him about his travels and the money in his luggage. Eventually, Defendant admitted that the money was his and that he brought it to Puerto Rico to buy cocaine. Id. at 104. Following these admissions, Defendant invoked his right to counsel and the officers stopped the interview. Id. at 105. Agent Wardlow then called the United States Attorney's Office to determine how to proceed. Id. at 105. At the direction of the on-call Assistant United States Attorney, the officers arrested Defendant. Id. at 106.

**B. The Pending *Motion to Suppress***

On June 8, 2021, Defendant filed the pending *Motion to Suppress*, challenging the validity of his initial encounter with the TFOs and the voluntariness of his Miranda waiver and subsequent admissions. (Docket No. 38). In particular, he contends that the TFOs' questioning outside of the baggage claim area violated his

constitutional rights because the alleged seizure was neither supported by a warrant nor based on a reasonable suspicion of any criminal activity. (Docket Nos. 38 at 10; 53 at 10-11). Additionally, he argues that the officers used deception, tricks, and misrepresentations to coerce him into waiving his rights and offering confessions. (Docket No. 38 at 10-12). Thus, according to Defendant, such actions and statements were involuntary, and any evidence or statements obtained as a result should be suppressed. Id.

**C. The Evidentiary Hearing**

This Court held an evidentiary hearing on March 11, 2022, during which TFO Ruisanchez, TFO Santos-Cordova, and Agent Wardlow testified. (Docket No. 58). At the hearing, defense counsel affirmatively limited the scope of the *Motion to Suppress* by expressly stating on multiple occasions that Defendant was only challenging the initial intervention in the baggage claim area and objecting to testimony from the officers that touched on subjects other than the initial intervention. Id. at 29, 95-97, 99, 103.

**D. Post-Hearing Briefing**

Following the evidentiary hearing, each party submitted additional briefing in further support of its arguments. (Docket Nos. 67; 69). In his post-hearing submission, Escobar-Lopez reiterates his contention that the TFOs violated his Fourth Amendment rights by "seizing" him outside of the baggage claim

area without any reasonable suspicion of criminal activity. (Docket No. 67). Additionally, Defendant contends the canine sniff and subsequent search were: (1) impermissible because the officers lacked reasonable suspicion of criminal activity, and (2) involuntary because the officers did not inform him of his rights prior to the canine sniff. Id. The United States of America (the "Government") argues that Defendant's interaction with the TFOs and the subsequent canine sniff were consensual and thus did not require any prior reasonable suspicion of criminal activity. (Docket No. 69 at 4). Additionally, the Government avers the testimony presented at the evidentiary hearing clearly establishes that Defendant knowingly and voluntarily waived his rights before being questioned in the CBP area. Id. at 7-8.

### E. Issues Before the Court

Although Defendant's briefing is not a model of clarity, he seemingly raised a slew of challenges to the officers' conduct in his original *Motion to Suppress*, lengthy reply brief, even longer post-hearing brief, and during the evidentiary hearing. (Docket Nos. 38; 53; 58; 67). Several of those challenges were mentioned in passing in the briefing but never fully developed, many were expressly waived at the evidentiary hearing, and some were raised for the first time in Defendant's post-hearing brief. As the First Circuit Court of Appeals has stated, "**[a] litigant seeking to suppress evidence cannot jump from theory to theory like a bee**

**buzzing from flower to flower.**" United States v. Bashorun, 225 F.3d 9, 13 (1st Cir. 2000) (quoting United States v. Torres, 162 F.3d 6, 11 (1st Cir. 1998)) (emphasis added). The Court thus limits its analysis to the lawfulness of the: (1) TFOs' initial questioning outside of baggage claim; (2) canine sniff; and (3) waiver of Miranda rights. Each of these is addressed in turn below.

## II.   ANALYSIS

### A. The TFOs' Initial Questioning Did Not Infringe on Defendant's Fourth Amendment Rights

Defendant primarily challenges what he refers to as the "initial interdiction" between himself, Ruemmele, TFO Ruisanchez, and TFO Ayala. In his view, the TFOs needed at least reasonable suspicion of criminal activity to lawfully ask him questions at the airport. (Docket No. 53 at 7-13). However, Defendant's argument fails because the initial intervention was not a Fourth Amendment event.

"Not every interaction between a police officer and a citizen constitutes a seizure triggering Fourth Amendment protections." United States v. Ford, 548 F.3d 1, 4 (1st Cir. 2008) (citations omitted). In the First Circuit, a seizure *only* occurs when one's liberty is restrained by either physical force or an assertion of authority. Id. This inquiry is objective, not subjective. Therefore, "we look not to whether the citizen perceived that he was being ordered to restrict his movement, but whether the

officer's words and actions would have conveyed that to a
reasonable person." Id. at 5 (internal quotation marks and
citations omitted).

It follows that "a seizure does not occur simply because a
police officer approaches an individual and asks a few questions.
So long as a reasonable person would feel free to disregard the
police and go about his business, the encounter is consensual and
no reasonable suspicion is required." Florida v. Bostick, 501 U.S.
429, 434 (1991) (internal quotation marks and citation omitted).
To that end, the Supreme Court has made clear that:

> [L]aw enforcement officers do not violate the
> Fourth Amendment by merely approaching an
> individual on the street or in another public
> place, by asking him if he is willing to answer
> some questions, by putting questions to him if
> the person is willing to listen, or by
> offering in evidence in a criminal prosecution
> his voluntary answers to such questions.

Florida v. Royer, 460 U.S. 491, 497 (1983) (citations omitted).

The Supreme Court has provided a non-exhaustive list of
circumstances that may indicate a seizure has occurred. These
include "the threatening presence of several officers, the display
of a weapon by an officer, some physical touching of the person of
the citizen, or the use of language or tone of voice indicating
that compliance with the officer's request might be compelled."
United States v. Mendenhall, 446 U.S. 544, 554 (1980) (citations
omitted).

Here, under the totality of the circumstances, the Court finds that a reasonable person in Defendant's position would "feel free to disregard the police and go about his business." Bostick, 501 U.S. at 434. TFO Ruisanchez and TFO Ayala testified that they calmly approached Escobar-Lopez and Ruemmele, identified themselves as officers, asked if they were willing to talk, received affirmative consent, and then proceeded to ask questions for as long as Escobar-Lopez and Ruemmele were willing to engage. (Docket No. 58 at 9-12, 61). The TFOs did not show force and repeatedly testified that they did not order Defendant to say or do anything. Id. While they asked for identification, "that is the type of de minimis intrusion that [the First Circuit has] long agreed to tolerate as a necessary part of policing." United States v. Tanguay, 918 F.3d 1, 7 (1st Cir. 2019) (citations omitted) (finding no show of authority when officer asked, but did not order, the defendant to provide his license).

Additionally, the officers did not confront Defendant with "accusatory questions." Cf. United States v. Camacho, 661 F.3d 718, 725 (1st Cir. 2011) (holding that the defendant's initial detention constituted a seizure rather than a consensual encounter where, inter alia, the officers confronted the defendant with "accusatory questions"). TFO Ruisanchez testified that, in their initial conversation, he asked Defendant about his travel plans, his luggage, and whether he was traveling or coordinating his

travel with anyone else. (Docket No. 58 at 9-12). The most specific question in this initial conversation concerned whether Defendant had any money in his luggage. Id. at 12. However, similar lines of questioning have been approved by the First Circuit. *See, e.g.*, United States v. Beras, 183 F.3d 22, 25 (1st Cir. 1999) (finding that questioning a passenger at an airport about the amount of money in his possession does not violate the Fourth Amendment).

In sum, the Court finds Defendant's liberty was not restrained, and thus his initial encounter with the TFOs was a consensual conversation and not a seizure for purposes of the Fourth Amendment.

## B. The Canine Sniff Was Consensual and Properly Conducted

Next, Defendant challenges the constitutionality of the canine sniff of his luggage. (Docket No. 67 at 23-25, 27).

First, and as a general matter, the Supreme Court has held "that officers — even without any basis for suspecting that an individual has committed a crime – 'may . . . request consent to search his or her luggage – as long as the police do not convey a message that compliance with their requests is required.'" Tanguay, 918 F.3d at 5 (quoting Bostick, 501 U.S. at 434-35). Additionally, the First Circuit has long held that "[w]hether a search is justified by voluntary consent is a question of fact to be determined from all the circumstances[.]" United States v. Race, 529 F.2d 12, 15 (1st Cir. 1976). Here, Defendant affirmatively

consented to the canine sniff during his initial lawful and
consensual encounter with the TFOs outside of baggage claim.
(Docket No. 58 at 12-13). As noted above, the Court sees no
evidence that the officers objectively conveyed a message that
compliance with their requests was required or that Defendant's
consent was otherwise involuntary. Further, Defendant was never
handcuffed or forcibly moved back into the baggage claim area. The
evidence establishes that he followed the officers into baggage
claim on his own accord.

Second, Defendant argues that the initial search of his
luggage was improper because the Government did not justify the
search under an exception to the Fourth Amendment's warrant
requirement. (Docket No. 53 at 13). However, **a dog sniff "is not
itself a search."** United States v. De Los Santos Ferrer, 999 F.2d
7, 10 (1st Cir. 1993) (citing United States v. Place, 462 U.S.
696, 707 (1983)) (emphasis added). Therefore, the officers were
**not** required to obtain a warrant or establish an exception to the
warrant requirement to justify the consensual exposure of
Defendant's luggage, which was located in a public place, to a
canine trained to detect the presence of controlled substances.
*See* Place, 462 U.S. at 707. Additionally, the officers did not
open the luggage before the canine conducted the sniff. *See* id.
(explaining that a canine sniff does not constitute a "search"
within the meaning of the Fourth Amendment in part because it does

not expose noncontraband items to the public and is not as intrusive as a typical search).

Third, the Court finds the officers conducted the canine sniff in a permissible manner. The sniff occurred in a public place and, according to the testimony at the evidentiary hearing, happened within minutes of Defendant's consent thereto. (Docket No. 58 at 79-80); *cf.* Rodriguez v. United States, 575 U.S. 348 (2015) (holding officers could not prolong a valid traffic stop to conduct a dog sniff).

Finally, no evidence supports Defendant's claim that the canine did not alert to his bag. While Defendant contends in his sworn affidavit that Chivika did not react to his luggage during the sniff, all three testifying officers confirmed at the evidentiary hearing that Chivika indicated the presence of contraband in Escobar-Lopez's luggage. (Docket Nos. 53-1 at 3; 58 at 13, 79, 88). At the hearing, the Court heard testimony concerning the training and qualifications of both Chivika and his handler, TFO Santos-Cordova. In particular, TFO Santos-Cordova discussed his years of experience working with canine enforcement units generally and with Chivika specifically. (Docket Nos. 57-10; 57-11; 57-12; 58 at 76-78). In fact, TFO Santos-Cordova and Chivika had been certified to conduct such inspections together since 2011. (Docket Nos. 57-10; 58 at 76). While defense counsel cross-examined TFO Santos-Cordova concerning Chivika's training

and capacity to identify drugs, he failed to undermine the canine's reliability. (Docket No. 58 at 81-82). Considering his training and expertise, the Court credits the testimony of TFO Santos-Cordova concerning Chivika's alerts during the canine sniff over Defendant's assertion to the contrary. *See* <u>Florida v. Harris</u>, 568 U.S. 237, 246-47 (2013) (holding that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert" provided the defendant has an opportunity to challenge such evidence).

In summary, the Court finds that the officers properly handled the canine sniff. The sniff was validated by Defendant's affirmative and voluntary consent and was conducted in an appropriate manner. Therefore, the Court will not suppress any evidence related to the sniff.

**C. Defendant Knowingly and Voluntarily Waived His <u>Miranda</u> Rights**

Finally, Defendant contests the validity of his <u>Miranda</u> waiver and the admissibility of his subsequent admissions. (Docket No. 38 at 8-12). While Defendant argues in his post-hearing brief that the officers also violated his Sixth Amendment right to counsel, "[b]y its very terms, the Sixth Amendment becomes applicable only when the government's role shifts from investigation to accusation." <u>United States v. Boskic</u>, 545 F.3d 69, 84 (1st Cir. 2008) (explaining that a suspect challenging a violation of his right to counsel during a pre-arraignment

interrogation must rely on the Fifth Amendment "and the prophylactic, now constitutionalized rule of Miranda"). Thus, the Court will discuss only whether Defendant's Fifth Amendment rights were violated.[2]

As an initial matter, the parties disagree as to whether Defendant was in custody while in the CBP area of the airport. This disagreement is relevant because officers are only required to provide Miranda warnings before conducting a "custodial interrogation." *See* Miranda v. Arizona, 384 U.S. 436, 444 (1966). Hence, "the need for a Miranda warning turns on whether a suspect is in custody." United States v. Swan, 842 F.3d 28, 31 (1st Cir. 2016) (internal quotation marks and citation omitted). While this threshold matter is certainly important, the Court need not decide it at this juncture because, as explained below, Defendant **knowingly and voluntarily waived his Miranda rights before any interrogation began.**

It is well established that once a suspect is advised of his Miranda rights, "he may waive those rights and consent to an interrogation." United States v. Carpentino, 948 F.3d 10, 20 (1st Cir. 2020) (citation omitted). To determine the validity of such a waiver, courts must "ask whether, appraised in light of all the

---

[2] Nonetheless, "a valid waiver of Fifth Amendment rights typically will suffice to accomplish a waiver of the Sixth Amendment right to counsel in the context of police questioning of a defendant." Id. at 84 n.17 (citing Patterson v. Illinois, 487 U.S. 285, 296 (1988)).

circumstances, the waiver was both knowing and voluntary." Id. at 26 (citations omitted). A suspect knowingly waives his Miranda rights if he is fully aware of the nature of the rights being abandoned and the consequences of the decision to abandon them. Id. A waiver is made voluntarily if it is "the product of a free and deliberate choice rather than intimidation, coercion and deception." Id. (internal quotation marks and citation omitted). The government bears the burden of establishing the validity of a Miranda waiver by a preponderance of the evidence. Id. (citation omitted).

    1. *Defendant Knowingly Waived His Miranda Rights*

    Here, the Court finds that the Government has established Defendant's knowing waiver of his Miranda rights. TFO Ruisanchez testified that he personally read Defendant his rights and asked Defendant if he understood each one. (Docket No. 58 at 31). Additionally, Escobar-Lopez read the Advice of Rights form in Spanish and initialed next to each right to confirm he understood the nature of what he was waiving. (Docket Nos. 57-8; 58 at 31). The only question Defendant asked the officers was whether he had to sign the document, and Agent Wardlow confirmed that no officer ever instructed Defendant that he had to sign. (Docket No. 58 at 93).

    Considering the totality of the circumstances, the Court finds Defendant was fully aware of the nature of the rights being

abandoned and the consequences of his waiver. *See* <u>Carpentino</u>, 948 F.3d at 26.

> 2. *Defendant <u>Voluntarily</u> Waived His <u>Miranda</u> Rights*

Additionally, the Government established Defendant's wavier was voluntary. As an initial matter, the record makes clear that the officers never told Defendant that he had to speak. (Docket No. 58 at 112-13, 118). In fact, the Advice of Rights form that Defendant knowingly signed explained precisely the opposite – that Defendant had a right to remain silent. (Docket Nos. 57-8; 58 at 118). Further, Agent Wardlow told Escobar-Lopez that it was "more important for him to tell [] the truth than to lie" and that the officers would rather Defendant not speak at all than tell a lie. (Docket No. 58 at 112).

Nonetheless, Defendant contends that he felt pressured to sign the Advice of Rights form and speak with the officers, and thus was impermissibly coerced into doing so, because the officers repeatedly told him he had to tell the truth. (Docket Nos. 38 at 11; 53 at 17-18; 53-1 at 6-8). The Court disagrees. It is well established that "[n]either an admonition to tell the truth (even if repeated) nor a suggestion that cooperation would lead to favorable treatment is enough, without more, to constitute impermissible coercion." <u>Carpentino</u>, 948 F.3d at 28 (citations omitted). Therefore, while Agent Wardlow reiterated to Escobar-Lopez the importance of telling the truth and the consequences of

failing to do so, this does not amount to impermissible intimidation, coercion, or deception.

Defendant also argues that he did not voluntarily waive these rights because he was never explicitly told that he was a criminal suspect. (Docket No. 38 at 5-7). Thus, Defendant contends that the officers had a duty to address his doubts concerning why he was being read Miranda rights if he was not under arrest. Id. at 7. However, the Supreme Court has "never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." Moran v. Burbine, 475 U.S. 412, 422 (1986) (citations omitted). To that end, courts have held that an agent's "failure to inform [a] [d]efendant that he was the subject of their investigation does not amount to affirmative deceit unless [the] defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead." United States v. Sawinski, 2000 WL 1357491, at *5 (S.D.N.Y. 2000) (citing United States v. Mitchell, 966 F.2d 92, 100 (2d Cir. 1992)); *see also* Boskic, 545 F.3d at 80 (holding officers' specific assurance that defendant was not under investigation was not coercive). Because Escobar-Lopez has not shown that his confessions were procured by "coercive official tactics," this argument also fails. *See* Boskic, 545 F.3d at 78. Thus, the evidence establishes that Defendant voluntarily waived his Miranda rights.

3. *The Officers Stopped Their Questioning Once Defendant Invoked His Rights*

Finally, not only did the officers properly advise Defendant of his rights, they also properly respected his exercise of those rights. It is well known that "[i]f the suspect invokes his right to counsel at any point during the interrogation, all questioning must cease either until an attorney is present or until the suspect initiates further communication with the officers." Carpentino, 948 F.3d at 20 (citations omitted). Agent Wardlow testified that, at some point during the interview, Defendant specifically requested an attorney. (Docket No. 58 at 105). At that point, the officers stopped the interview and did not reinitiate it. Id. Defendant failed to posit anything to the contrary. Thus, the officers complied with Miranda and its progeny, and Defendant may not now seek to suppress any of his statements on the basis of a Miranda violation.

### III.   CONCLUSION

For the foregoing reasons, Escobar-Lopez's *Motion to Suppress* at Docket No. 38 is **DENIED**. Defendant's initial conversation with the TFOs and the subsequent canine sniff were consensual, the officers conducted the sniff in a proper manner, and Defendant knowingly and voluntarily waived his Miranda rights before his interrogation. Thus, the evidence and statements challenged are admissible at trial.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 22nd day of June 2022.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge